JOHN McSHAIN, INC., Appellant,

v.

L'ENFANT PLAZA PROPERTIES, INC., Appellee.

L'ENFANT PLAZA PROPERTIES, INC., Appellant,

v.

JOHN McSHAIN, INC., Appellee.

Nos. 12462, 12642.

District of Columbia Court of Appeals.

Argued June 14, 1978.

Decided June 5, 1979.

---

John F. Mahoney, Jr., Washington, D. C., for appellant in No. 12462 and appellee in No. 12642.

Warren K. Kaplan, Washington, D. C., with whom Stephen G. Burns, Washington, D. C., was on the brief, for appellee in No. 12462 and appellant in No. 12642.

Before KELLY, KERN and GALLAGHER, Associate Judges.

GALLAGHER, Associate Judge:

L'Enfant Plaza Properties, Inc. (L'Enfant) sued John McShain, Inc. (McShain) for damages due to the delay in a construction project occasioned by the defendant's trespass. The trial court entered judgment for L'Enfant in the amount of $291,276.31, plus costs. McShain appeals and L'Enfant cross-appeals.

L'Enfant is a real estate developing company responsible for the construction of the East building of L'Enfant Plaza. The East building was part of Stage II of the construction process for the entire L'Enfant Plaza hotel and office complex.[1] On May 11, 1971, construction began on Stage II.[2] The construction contract for Stage II called for the building to be completed within twenty months of commencement of work; thus, the building was required to be finished by January 11, 1973.

---

1. Stage I consisted of the central portion of the East building up to and including the Plaza level. This had been completed several months prior to 1971.

2. Stage II involved the performance of footing and concrete work along the eastern and western sides of the East building property up to the Plaza level, constructing the tower from the Plaza level to the roof level, and generally completing the East building.

On June 11, 1971, L'Enfant's contractor, the George Hyman Construction Company (Hyman), discovered an encroachment upon L'Enfant's land. This encroachment was made of concrete reinforced with steel bars and extended from the footings of the building on the adjacent property—owned by the Department of Housing and Urban Development (HUD) constructed by McShain. It varied in thickness from eighteen to forty-two inches, was located about twenty-three feet below grade, and ran along the common boundary for approximately 240 feet.

On June 23, McShain, having agreed to assume responsibility for the removal of the encroachment, hired a subcontractor to do the work. This work lasted from June 28 until July 16—including removal of the debris.

The building was finally completed on June 25,. 1973. L'Enfant filed this complaint almost a year later, on June 21, 1974. The trial court granted McShain's motion for summary judgment on the ground that suit was barred by the applicable statute of limitations—which provides a three-year limit.[3] On appeal, we reversed, holding that the encroachment constituted a continuing trespass, which accordingly gave rise to successive causes of action until its removal. *L'Enfant Plaza East, Inc. v. John McShain, Inc.*, D.C.App., 359 A.2d 5, 7 (1976). We remanded for trial to determine the amount of damages incurred on or after June 21, 1971. *Id.*

After remand, the trial court granted L'Enfant's motion for partial summary judgment on the issue of liability. The parties then proceeded to trial on the proper measure of damages. The trial court, sitting without a jury, entered judgment for L'Enfant—concluding that McShain had been responsible for a thirty-one day delay, but that recovery for six of those days was barred by the statute of limitations. Its calculations of damages included: the added field supervision, overhead and equip-

ment; the escalation of labor and material costs; the extra cost of concrete; and lost profits.

On appeal, McShain concedes that the evidence supports a finding of a net delay of fourteen days and that the appropriate measure of damages is $2,839.84 per day.[4] McShain attacks eighteen separate findings of fact, however, as clearly erroneous. It also attacks, as unsupported, the trial court's conclusion that the delay caused by defendant carried over—undiminished—to the time of the building's completion.

On cross-appeal, L'Enfant argues that the statute of limitations does not bar its claim for "lost profits which were partially attributable to pre-June 21, 1971 delay since those damages were not ascertainable with reasonable certainty until after June 21, 1971."

■ The specific findings attacked by McShain all relate to either one or the other of its essential arguments: (1) that the evidence does not support the court's conclusion that defendant was responsible for a net delay of thirty-one days; and (2) that there is no evidence to show that the encroachment-caused delay, however long it was, was carried over undiminished for about two years to delay the final completion date by the same number of days.

When reviewing the decision of a trial court, which has sat without a jury, we may not set aside its judgment "except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code 1973, § 17–305(a); *Max Holtzman, Inc. v. K&T Co.*, D.C.App., 375 A.2d 510, 512 (1977); *Parking Management, Inc. v. Gilder*, D.C.App., 343 A.2d 51, 54 (1975). Consequently, we must determine whether the findings challenged by McShain have support in the record.

Finding Number 14:

During removal of the encroachment, Hyman's intended north-to-south progress along the east side was effec-

---

**3.** D.C.Code 1973, § 12–301(3).

**4.** This is the figure the court used in measuring L'Enfant's damages due to added field supervision, overhead, and equipment costs.

tively foreclosed. . . . Although Hyman was able to continue pouring concrete on the west side and on the east side north of Column Line 11, it was unable to pour any concrete on the east side south of Column Line 11 (except underpinning work, discussed below) until July 14.

McShain asserts that certain evidence is contrary to this finding. First, it points to testimony indicating that the construction and pouring of footings was proceeding north to south from column sixteen through twelve on June 18. This evidence does not, however, negate the finding, but in fact supports it, because the court specifically noted that Hyman was able to continue pouring concrete "on the east side north of Column Line 11." Second, McShain refers to testimony that on July 6 Hyman poured concrete for underpinning pits numbers six and nine on the east wall. Again, this evidence is not inconsistent with the court's finding but supports it. The court's finding specifically excepts underpinning work. Third, McShain refers to testimony purportedly showing that concrete was poured on July 10 for a service slab at columns ten and eleven—in the encroachment area. McShain, however, mistakenly views the evidence; its reference to the testimony indicates that on July 12, only the placement of reinforcing bars occurred at the "strap beam and footings at Lines 10 and 11," whereas concrete for the service slab was poured north of the main encroachment area at lines fifteen and sixteen. The court expressly noted that "some preliminary form construction and rebar placement took place in the encroachment area during the two or three work days prior to July 14, [and] had there been no encroachment this work would have been done during the period June 11 through 14 . . . ." Fourth, McShain contends that a photograph shows five footings were constructed between June 2 and July 6 on the east side of the encroachment to support five concrete columns. Examining this photograph in light of the testimony explaining the position of those footings and columns, we observe that McShain is inaccurate. The footings and columns in the photograph are north of the principal encroachment area. Of the two sets of footings and columns depicted, the ones McShain refers to are closest to the east wall, but the southernmost is column number twelve—just north of the encroachment area. The fifth item relied upon by McShain to undermine the court's finding is testimony concerning the sequencing of construction operations. The testimony shows that the encroachment interrupted the previously planned sequencing, but that the desired sequencing was again achieved on July 11. This sequencing refers, however, only to the performance of the underpinning work and not to the sequential pouring of footings, which the court found did not begin until July 14. It is apparent that McShain's assertions do not serve to undermine the court's finding.

Finding Number 18, in pertinent part, is as follows:

From June 15 until July 14 no concrete whatsoever was poured south of Column Line 11, with the sole exception of the eleven yards of concrete used for the underpinning . . . . [However] some preliminary form construction and rebar placement took place in the encroachment area during the two or three work days prior to July 14 . . . ..

McShain refers to evidence that on July 13 footings were constructed at columns nine, ten, and eleven. The testimony it relies on, however, indicates only that the construction there consisted of "[r]ebar placement at strap line and footings. . . ." There is nothing to demonstrate that any concrete was poured in those footings. Again the evidence relied upon by McShain does not support its contention.

In Finding Number 19, the court states:

The effective delay due to the main encroachment should, accordingly, be measured from the time the pouring of the concrete footings would have begun in the encroachment area (June 15) to the time said work was actually commenced (July 14), which period amounts to twenty-nine calendar days.

Four of the five references to the evidence by McShain here are unrelated to the work in the encroachment area. The encroachment area where work was delayed extended from column number eleven south to column three. Each of the four references concerns work in the area from columns twelve through sixteen. The fifth reference is again to the construction of footings for columns nine through eleven on July 13—which we have already addressed in our discussion of Findings Number 14 and 18.[5] Thus, McShain's argument here is misdirected.

In Finding Number 20, the court addressed the effects of this delay on the work force.

The impact of the encroachment persisted beyond the resumption of the pouring of concrete on July 14. This further delay was chiefly the result of disruption of the labor force. Trial testimony and the daily record of construction activity . . . show that the force of laborers and carpenters on the job grew steadily from May 11 until the encroachment stoppage necessitated layoffs beginning approximately June 18–21. The number of carpenters and laborers on the job reached its nadir on June 28 [12 carpenters and 29 laborers], and then started gradually rebuilding. The prior peak levels of June 18–21 were not regained, however, until July 23 [39 carpenters and 59 laborers], nine days after the resumption of concrete work in the encroachment area.

Appellant's attempt to undermine this finding rests solely on a recitation of the total number of employees—*of all types*—on the job from June 15 through July 16.[6] This recitation is misleading because only carpenters and laborers did the foundation work. The figures in the court's finding here are supported by the Daily Record of Construction Activity.

The trial court stated in Finding Number 21:

Hyman's rebuilding of its work force between July 14th and July 23rd was not merely a matter of time lost until the earlier numbers of laborers and carpenters on the job was reattained; it was equally a matter of delay stemming from integrating the new men into the work crew—the standard process of weeding out, screening and orienting the men to perform their appointed functions most efficiently. . . . Mr. Lippe estimated that the overall time lost from the rebuilding process during this period represented three working days. This testimony was not challenged or contradicted.

McShain challenges this finding in two ways. It contends that the testimony of Mr. Lippe, an expert witness,[7] concerning the three-day, re-integration delay was sheer speculation because not based on personal knowledge of the daily activity at the construction site and because inconsistent with the figures measuring the total number of employees—regardless of function—on the site.

 There is no necessity that an expert witness testify from personal knowledge, so long as the opinion is "based upon hypothetical questions which assume a state of facts supported by the evidence." *Logsdon v. Baker*, 366 F.Supp. 332, 336 (D.D.C. 1973), *vacated*, 170 U.S.App.D.C. 360, 517 F.2d 174 (1975); *accord, Ohio Valley Construction Co. v. Dew*, D.C.App., 354 A.2d 518, 523 (1976). The basis of those hypothetical facts "must be established by independent evidence properly introduced."

---

5. As we stated there, the court's finding refers to the pouring of concrete into the footings—not the preparation for pouring through the installation of reinforcing bars.

6. At the end of its recitation of those numbers, appellant also attacks, as speculative, the testimony of a witness who opined that there was a three-day delay attributable to "reintegration" of the work force. We treat this argument in

connection with McShain's attack on Finding Number 21.

7. McShain stipulated at trial that Mr. Lippe is "a qualified civil engineer to give an opinion." Mr. Lippe's qualifications include having written and lectured on the subject of construction delays and damages and the effects on the original construction plans.

*Logsdon v. Baker, supra* 170 U.S.App.D.C. at 361, 517 F.2d at 175. Here, Mr. Lippe's testimony was based on his review of the plans and specifications for the project and other construction data and documents—all of which were included in L'Enfant's exhibits and had been admitted into evidence. On the basis of that evidence, he testified specifically that

> during the period from July 14th to July 22nd,[8] 1971, there was a gradual buildup of Hyman's forces and a gradual resurgence of the momentum that had been interrupted at the time the encroachment had been discovered. And during that period of time I calculated that there was an additional loss of about 3 days until full production had been resumed.

> . . . . .

> [Rebuilding the momentum after July 14th] refers to two things. One, that you, Hyman started to add more men onto the payroll. And second, the learning period that these men had to go through until they were familiar with the operation and integrated into the crews that were already in existence.

Mr. Lippe based his statements on the decline and then gradual build-up of the number of carpenters and laborers on the Daily Record of Construction Activity. As we said previously, the only pertinent employee figures are those for carpenters and laborers—not the total number of employees on the entire site. Accordingly, this finding is also supported by the record.

■ Finding Number 22 is quite significant and reads, in full, as follows:

> Nominal construction progress for this project was delineated in Hyman's progress schedule (Def. Ex. 3). The earliest critical event shown on that progress schedule was completion of the foundation work through the plaza level by September 6th. Hyman arrived at this point on October 9, 1971, thirty-three days late (Testimony, Lippe). Although none of the delay up to completion of the plaza level appears attributable to a cause other than the encroachment (Testimony, Jenkins), the court nevertheless concludes that L'Enfant has carried its burden of proof only to the extent that it has affirmatively established that the main encroachment proximately caused the following delays:

(a) Removal of main encroachment,
June 15–July 14 : 29 days

(b) Remobilization of work force,
July 14–July 23 : 3 days

Total : 32 days

McShain contends that Mr. Lippe's testimony concerning the October 9th completion date is "a bald assertion contradicted by the record."[9] It refers to progress photograph number sixty-eight as "conclusively" showing "that the foundation work on the plaza level was completed *before* August 6."[10] As Hyman's construction superintendent testified, this progress photograph, taken on August 4,[11] shows that construction had only reached the stage of installing a plywood deck on the second garage level. The second service level is two levels below the plaza level.[12] His testimony was the only direct evidence of that completion date. The Daily Record of Construction Activity also tends to support that date, however. This document indicates that after October 9, concrete was being poured from the plaza level up. Consequently, we cannot say the court's finding was without support in the evidence.

---

8. The trial court based its finding of the three-day reintegration delay on Mr. Lippe's testimony, which more accurately described the build-up period as lasting until July 22d, rather than the 23d, as the court had indicated in Finding Number 20. Accordingly, the one-day discrepancy does not affect the validity of the ultimate finding, *i. e.*, the three-day delay.

9. Brief for Appellant at 20.

10. *Id.*

11. The record indicates August 4, not August 6, as stated by L'Enfant. See Brief for Appellee at 20–21.

12. The levels beneath the plaza level consist of the promenade, two levels of garages, and a service floor.

McShain also challenges several other findings, all for the same reason: that they are purportedly "based on the unproven premise that a period of delay created in June-July 1971 was carried over undiminished into 1973." As L'Enfant points out, McShain "does not challenge any of the itemized damage calculations for lost profits or extra labor and material costs incurred as a result of the delay, but contends only that the continuation of the effect of the delay was not adequately proved." We consider McShain's challenge to those findings inextricably woven into its argument that the trial court erred in concluding from evidence that the completion of the entire project was delayed thirty-one days by the encroachment.

We begin with the trial court's statement in Finding Number 22, which we have held is supported by the evidence, that the completion of the foundation work through the plaza level was scheduled for September 6, but not actually achieved until October 9—a total of thirty-three days late. The court then stated, however, that L'Enfant had carried its burden of proof only as to thirty-two days of the delay being directly attributed to the encroachment. In Finding Numbers 23 and 24—unchallenged by appellant—the court reduced this figure by one day due to an underpinning delay which would have occurred regardless of the encroachment. Thus, the court arrived at the net figure of a thirty-one-day delay, as of October 9, 1971. The entire building was required by contract to be completed by January 11, 1973—i. e., twenty months from the commencement of construction on May 11, 1971. According to Hyman's progress schedule, however, the projected completion date was February 11, 1973. In any event, uncontradicted testimony shows that the project was substantially completed by about May 31, 1973 and totally completed late in December 1973. L'Enfant uses the

May 31 date to demonstrate that the entire building's substantial completion was thus 143 days late—measuring from January 11, 1973.[13] Measuring from the projected February 11 date instead, the delay amounted to 112 days.

McShain does not dispute that there was a substantial delay in completing the project, nor the total number of days delay, but just the number of days attributable to it because of the encroachment. In fact, McShain concedes it was responsible for a net delay in concrete construction of fourteen days, with damages calculable at $2,839.84 per day. Consequently, it admits liability for the delay in the amount of $39,757.16 ($2,839.84 × 14). McShain states that this "amount was included in the $81,950 paid by L'Enfant to Hyman in September 1971 *for the delay* in question."[14] It also concedes it owes pre-judgment interest on that principal amount—$39,757.16—at the rate of six percent per annum from September 1971 to January 1976[15]—bringing its total liability to $54,268.91. McShain argues though that "[a]ll other damages were based on an unproved assumption that this period of delay by a so-called 'ripple effect' was carried over intact to the period from January 11, 1973 to May 30, 1973."

McShain's argument overlooks the testimony of the expert witness, Mr. Lippe. He testified specifically that of the difference between January 11, 1973, and May 31, 1973, the portion of that delay in completion of the East building attributable to the encroachment is thirty-three calendar days. This testimony is sufficient to support the trial court's conclusion that the delay carried over through the project's completion.

Furthermore, the court's finding that a thirty-one-day delay attributable to the encroachment had occurred as of October 9, 1971 also supports its conclusion.

13. Brief for Appellee at 23.

14. Brief for Appellant at 14.

15. It is not clear why McShain decided upon this particular date, as judgment on McShain's liability was entered on October 1, 1976, and judgment on the issue of damages was not entered until May 2, 1977—as amended on June 17, 1977.

From proof that a certain relationship, status, condition, or state of affairs had existed, it may be presumed that such status, condition or state thereafter continued to exist, in the absence of proof to the contrary.

It is a presumption that is always disputable, sometimes entitled to considerable weight, but frequently liable to be rebutted by very slight circumstances. 1 Jones on Evidence § 3.82, at 297 (6th ed. 1972) (footnote omitted); 9 Wigmore on Evidence § 2530 (3d ed. 1940).[16] We think that once initial and final delays of 31 and 143 days, respectively, were established, the trial court could reasonably draw an inference[17] that the thirty-one days of lost time continued, subject to McShain's ability to contradict it. McShain did not offer any evidence to contradict it, and does not now point to any evidence in the record which rebuts that inference.

Rather, McShain argues that L'Enfant has the burden to prove that the entire delay in completion of the building was *not* due to other factors contributing to the delay, such as bad weather, strikes, change orders, and the like. We disagree and think that in the absence of evidence to the contrary, the trial court had ample basis to reach its conclusion.[18]

McShain's final argument relates to the trial court's finding that L'Enfant's "deferring completion of the southeast corner of the project in order to concentrate all of its forces on erecting the tower . . . was not causally related to the encroachment delay." (Finding No. 31.) McShain contends that this finding precludes damages for delay in completing the concrete construction, since "regardless of the encroachment delay plaintiff would have left the southeast wall incomplete to maintain an access road and would have suffered whatever delay and inefficiency that would have occurred therefrom." (Brief for Appellant at 24.) There is no merit to this contention.

L'Enfant had attempted to prove that the necessity to come back later to complete the southeast corner of the project caused additional costs. The trial court considered this claim but rejected it. It did not find that postponement of this work in any way af-

---

**16.** Presumptions of a continuing state of facts such as this has been applied in a multitude of situations, *e. g.,* agency, condition of livestock, course of business, physical conditions and objects, state of war and peace, et cetera. 1 Jones on Evidence, *supra* § 3.82, at 298 n.16.

**17.** Because this is, in effect, a presumption of fact and not of law, and because a presumption of fact is really not a presumption at all, 9 Wigmore on Evidence, *supra,* § 2491, at 288, we use the term "inference." As stated in Wigmore's treatise, "a 'presumption of fact', in the loose sense, is merely an improper term for the rational potency, or probative value, of the evidentiary fact." *Id.* These presumptions "have no significance so far as affects the duty of one or the other party to produce evidence, because there is no rule of law attached to them, and the jury may give to them whatever force or weight it thinks best,—just as it may to *other* evidence." *Id.* The use of the "term 'presumption' is due simply to historical usage, by which 'presumption' was originally a term equivalent, in one sense, to 'inference' . . ." *Id.*

**18.** The three cases principally relied on by appellant are not to the contrary. In *Karrick v. Rosslyn Steel & Cement Co.,* 58 App.D.C. 89, 25 F.2d 216 (1928), the court affirmed a finding by the trial court which had adopted a finding by a master that the amount of delay attributable to appellee's wrongful conduct was based on speculation. It does not appear that the master had the benefit of an expert witness to testify to the specific amount and source of delay, or building stage completion dates with which to measure progress, or specific facts from which it could find the amount of delay attributable to any specific source—unlike the facts here. In *Travelers Indemnity Co. v. Peacock Construction Co.,* 423 F.2d 1153 (5th Cir. 1970), the appellate court also affirmed as not clearly erroneous the trial court's finding that there were *too many factors* contributing to the delay and *too little proof* of the portions of delay specifically allocable to the various sources to justify an award of damages for the delay caused by a particular defendant's wrongful conduct. *Id.* at 1157. This, too, is unlike the situation here, because we have the trial court's finding, which we have affirmed, as to the specific number of days delay attributable to one isolated cause. The other factors contributing to the delay came after this time period and only as to those was there an absence of proof as to how much time delay each caused. The final case cited, *Vaughan v. Spurgeon,* D.C.App., 308 A.2d 236 (1973), is not relevant to the issue of damages due to delay.

fected the delay in the final completion date of the project. The court's denial of L'Enfant's claim for these extra costs therefore was irrelevant to the thirty-one-day completion delay.

The last issue—this one being raised by L'Enfant on cross-appeal—is whether L'Enfant is entitled to any damages for lost profits attributable to the six days of delay—from June 15 through June 20, 1971—which fall outside the applicable statute of limitations. We left this question open in our prior opinion. *L'Enfant Plaza East, Inc. v. John McShain, Inc., supra* at 7 n.7.

Though this claim is outside the statutory period, L'Enfant contends it is nevertheless not barred under the doctrine of *Zenith Radio Corporation v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). In *Zenith,* the Supreme Court noted that "[i]n anti-trust and treble damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered." *Id.* at 339, 91 S.Ct. at 806. The Court said:

> In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted. Otherwise future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery, contrary to the congressional purpose that private actions serve "as a bulwark of antitrust enforcement" and that the antitrust laws fully "protect the victims of the forbidden practices as well as the public." [*Id.* at 339–40, 91 S.Ct. at 806–807; citations omitted.]

In *Fitzgerald v. Seamans,* 180 U.S.App. D.C. 75, 533 F.2d 220 (1977), the circuit court elaborated on the *Zenith* decision:

> The *Zenith* doctrine arose in and has been confined to the area of antitrust treble damages recovery for lost profits. The *Zenith* exception to the statute of limitations is necessitated by the intersection of the traditional requirement of reasonable certainty of proof of lost profits and strong congressional policy in favor of antitrust enforcement by private damage suits. [*Id.* 180 U.S.App.D.C. at 82, 553 F.2d at 227; footnote omitted.]

L'Enfant counters with *Railing v. United Mine Workers of America,* 445 F.2d 353 (4th Cir. 1971), where a remand was ordered for consideration under the *Zenith* doctrine, in order to demonstrate that the anti-trust policy consideration present in *Zenith* was not necessary to the holding, pointing out that *Railing, supra,* was a suit for future lost profits under Section 303 of the Labor Management Relations Act brought by a coal company against a union's unlawful strike. But there again the linchpin of *Railing* was congressional intent, as it was in *Zenith.* The intent was found to be the same on timeliness no matter whether the case came under the Clayton Act or the Labor Management Relations Act. We have no such public interest consideration in this litigation.[19]

L'Enfant argues that to preclude it from recovering lost profits for the six days in question "is to require L'Enfant to have filed suit at a time when it was unaware of the *full extent of its damages* and when it was highly probable that a court would have found loss of profits to be too speculative to recover." (Emphasis added.) Since its loss of profits was not experienced until L'Enfant Plaza had begun operations in

19. L'Enfant also cites *Gahimer v. Virginia-Carolina Chemical Corporation,* 241 F.2d 836 (7th Cir. 1957). There, the plaintiff had purchased defective fertilizer, the effect of which could not be ascertained until the crop came up. The court held the statute of limitations did not commence until that time. This was simply an application of the discovery rule in this type of action.

Lastly, appellant refers us to *Hilton v. Duke Power Co.,* 254 F.2d 118 (4th Cir. 1958). *Hilton* involved the flooding of land from backup caused by a dam, this being a permanent, nonabatable cause. The law on this peculiar cause of action is not relatable to this case.

We have examined the other cases cited by L'Enfant and find none to be persuasive.

1974, says L'Enfant, those (six days) lost profit should be recoverable.

This is not the law. A decision in this jurisdiction demonstrates this rather well. In *H. Herfurth, Jr., Inc. v. Acker*, 85 U.S. App.D.C. 158, 177 F.2d 38 (1949), a general contractor hired a subcontractor to do some construction work. The latter breached in 1934 and the general contractor had to complete the project himself. It took until 1938 to determine the cost of completing the subcontractor's work. Suit was then brought. The applicable limitations period was three years. The court of appeals held that suit was barred by the statute because the damage-determining events "did not create claims. Claims arise when contracts are broken, not when the resulting damage is precisely ascertained." *Id.* 85 U.S.App. D.C. at 158–59, 177 F.2d at 38–39.

Later, in *Fitzgerald v. Seamans, supra*, a plaintiff charged that defendants tortiously deprived him of his civil rights and injured his reputation and career by wrongfully discharging him from his government post in 1970. Suit was brought in 1974 after it became clear that he could not obtain a reinstatement. The applicable limitations period was three years. Plaintiff argued, based on *Zenith*, that even if the wrong was fully accomplished by the time of his dismissal in 1970, the harm that emerged was too speculative to recover in advance, so that he should now be able to recover for the damage suffered in the three years preceding the filing of the complaint in 1974. The circuit court first rejected the argument that *Zenith* applied to this nonantitrust action. It then held: "Appellant was aware of wrongs done at the time of his discharge, and the fact of injury was sufficiently plain for his cause of action to accrue even though the extent and precise nature of the injury had not yet developed." 180 U.S.App.D.C. at 82, 553 F.2d at 227.

Courts have resisted attempts to hinge the running of the statute of limitations upon the complete ascertainability of lost profits. *See Davies v. Krasna*, 14 Cal.3d 502, 121 Cal.Rptr. 705, 535 P.2d 1161 (1975). In this case, L'Enfant was able to demonstrate its damages adequately to enable recovery. Extra costs and loss of profits were the measure of damages and these were susceptible of proof.[20]

We conclude the trial court did not err in concluding L'Enfant could not recover on its counterclaim for the first six days of delay.

*Affirmed.*

---

**20.** If the continuing tort has a cumulative effect, such that the injury might not have come about but for the *entire* course of conduct (*e. g.*, a physical condition brought about by long-term medical treatment), then all damages caused by the tortious conduct are recoverable even though some of the conduct occurred outside the limitations period. *Fowkes v. Pennsyl-* *vania R. Co.*, 264 F.2d 397, 398–99 (3d Cir. 1959).

If, on the other hand, the continuing tort is of the type that causes a series of separate or recurrent injuries, then only those damages stemming from conduct occurring within the limitations period are recoverable.