Charles J. BEARD, et al., Appellants,

v.

EDMONDSON AND GALLAGHER,
Appellee.

No. 97–CV–1985.

District of Columbia Court of Appeals.

Argued Feb. 10, 2000.
Decided Jan. 24, 2002.

---

Gregory G. Garre, with whom Allen R. Snyder, Washington, was on the brief, for appellants.

David J. Branson, Washington, for appellee.

Before RUIZ, REID, and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge.

Edmondson and Gallagher ("E&G"), a real estate development firm, contracted to purchase Alban Towers, an apartment building in Northwest Washington, D.C., from Georgetown University. The deal fell through because E&G no longer could secure adequate financing following a prolonged quiet title action against the Alban Towers Tenants Association ("ATTA"), which had attempted without success to exercise the tenants' right to purchase the building themselves. Three years later, E&G sued ATTA and ATTA's lawyers, Richard A. Gross and his law firm, Foley, Hoag & Eliot LLP ("Foley Hoag"), for interfering with its contract to purchase Alban Towers by clouding title to the property and litigating the quiet title action dishonestly and in bad faith. The case eventually went to trial, and the jury returned a verdict in favor of E&G against Gross and Foley Hoag.

On appeal to this court, Gross and Foley Hoag[1] argue for reversal on a number of grounds, one of which is that E&G's tortious interference claim was barred by the applicable three-year statute of limitations. We agree with that contention. E&G waited too long to pursue its claim against ATTA's lawyers, and as a consequence of its delay, we must reverse the judgment in its favor.

## I.

On July 1, 1986, E&G entered into a contract with Georgetown to purchase Alban Towers for $16 million. Pursuant to an escalator clause in the contract, the purchase price increased by $35,000 per month for each month that the closing was delayed.

The contract between E&G and Georgetown was subject to the tenants' statutory right of first refusal under the District of Columbia Rental Housing Conversion and Sale Act, D.C.Code §§ 45–1601 to –1663 (1996). That Act provided that before Georgetown could sell Alban Towers to a third party, it had to afford the tenants "an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale." D.C.Code § 42–3404.02(a) (2001), formerly § 45–1631(a) (1996). Hoping to take advantage of that opportunity, the tenants of Alban Towers formed ATTA, retained Gross and Foley Hoag, and negotiated their own proposed purchase contract with Georgetown. As a condition of finalizing that contract, ATTA was required to deliver to Georgetown by December 30, 1986 an earnest money deposit of $650,000 in the form of either an irrevocable letter of credit or cash. See D.C.Code § 42–3404.05(b) (2001), formerly § 45–1634(b) (1996) (providing that owner may require tenant to pay a deposit of up to 5% of the sales price in order to make a contract). When the deadline arrived, however, ATTA delivered to Georgetown only a check that was not backed by sufficient funds and that carried a notation that it was "to be held for deposit until ... replaced with a letter of credit." Georgetown refused to accept this unfunded check and informed ATTA that their negotiations were at an end and that it would sell Alban Towers to E&G.

Despite the inadequacy of ATTA's deposit check and Georgetown's termination of negotiations, on January 5, 1987, Gross filed on behalf of ATTA a Notice of Exercise of Rights of First Refusal with the District of Columbia Recorder of Deeds. The resulting cloud on title prevented

---

1. Charles J. Beard and the other individual appellants were the partners of Foley Hoag who were named as defendants below.

Georgetown and E&G from closing on their contract. Georgetown promptly commenced an action against ATTA in the District of Columbia Superior Court for a declaratory judgment that it could proceed with the sale of Alban Towers to E&G. Although the Recorder of Deeds expunged ATTA's notice on February 6, 1987, ATTA—represented in the action by Gross and Foley Hoag—opposed Georgetown's complaint and counterclaimed, seeking not only a declaration that the tenants still had the right to purchase Alban Towers but also damages. Thereafter, E&G intervened, joining in Georgetown's request for declaratory relief and, in addition, asserting a claim against ATTA for tortious interference with its contract and business relations.

On October 6, 1988, Judge Henry Greene granted summary judgment to Georgetown and partial summary judgment to E&G, declaring that they were "free to close on their third party contract for the purchase and sale of Alban Towers."[2] Judge Greene ruled, *inter alia,* that ATTA had failed to exercise its statutory rights or enter into a binding contract with Georgetown and that its rights had expired. In reaching that conclusion, Judge Greene stated that "while counsel for [ATTA] argued with force and imagination ... that the check tendered to Georgetown met the requirements of a 'cash deposit,' this court is satisfied as a matter of law that [ATTA's] assertion borders on the frivolous." On appeal,[3] this court affirmed in an unpublished opinion issued December 1, 1989, in which we specifically "agree[d] with the trial court that it borders on the frivolous to assert that [ATTA's deposit] check met the requirement of a 'cash' deposit."

After obtaining this court's decision, Georgetown formally notified E&G on December 14, 1989, that the closing on their contract of sale would take place on March 1, 1990 (pursuant to a contract provision specifying that the closing date would be ninety days after the expiration of the tenants' rights to buy the property). By this time, however, E&G found itself no longer able to obtain the financing it needed, and the deal collapsed. E&G attributed its inability to obtain sufficient financing to the fact that while the quiet title action was pending for three years, from early 1987 to the end of 1989, its costs had "foreseeably increased" in two major respects. First, the cost of purchasing Alban Towers had risen, by operation of the $35,000/month escalator clause in the contract of sale, from $16,000,000 to $17,365,000. Second, construction costs also had risen. When the cost increases from 1987 to 1989 were factored in, E&G determined that it needed a loan of $28,000,000 to purchase and develop Alban Towers. This was $2,000,000 more than E&G's bank was prepared to lend, based on its updated appraisal of the property.

On December 1, 1992—three years to the day after this court's decision terminating the quiet title action in favor of E&G and Georgetown—E&G instituted a

---

**2.** Summary judgment was not sought on E&G's tortious interference claim.

**3.** E&G moved for a stay pending appeal, which was granted, of its tortious interference claim against ATTA. E&G noted in its motion that it "may have similar tort claims against additional persons and entities ... who are not parties in this case," adding that if the case was remanded for trial,

it would be natural and appropriate for Edmondson & Gallagher and [ATTA] to reactivate the tort claims and litigate all of the issues between them. However, if that right is not preserved by a Court-approved stay, Edmondson & Gallagher runs the risk of losing its claims by operation of the statute of limitations. *See* D.C.Code § 12–301 (1986).

new lawsuit in Superior Court against ATTA and its lawyers, Gross and Foley Hoag, for tortious interference with contractual relations.[4] E&G charged that from 1987 through the end of 1989, the defendants thwarted its purchase of Alban Towers by clouding title to the property and resisting Georgetown's efforts to remove the cloud in the quiet title litigation. E&G charged that Gross in particular maintained and prolonged the *lis pendens* in bad faith—knowing that ATTA's defense was baseless-and by improper means, including perjury, bribery and falsification of evidence in the quiet title action.[5]

Prior to trial, ATTA, Gross and Foley Hoag moved to dismiss the complaint or, in the alternative, for summary judgment. They argued that the tortious interference claim was barred by the statute of limitations because it was based on events that took place more than three years before the complaint was filed in December 1992. Superior Court Judge Richard Levie denied the motion, ruling that the defendants' litigation of the quiet title action constituted a "continuing tort" which tolled the running of the statute of limitations until the litigation finally ended:

> Plaintiffs' claim for tortious interference with contractual relations is, in this

case, a continuous tort that falls within the statutory period. Defendants claim that Plaintiffs knew of the allegedly tortious conduct from the time the lis pendens was filed in 1987 and that this knowledge started the limitations clock running.... Plaintiffs claim that because the cloud on title continued until the end of the litigation, the tort was continuous in nature and the statute did not begin to run until at least 90 days after December 22, 1989, the date the Court of Appeals issued its mandate.[6]

The conduct that Plaintiffs complain of, i.e., Defendants' interference with the contract, was continuous. Plaintiffs were unable to exercise their contractual rights while the cloud was cast on the title. Defendants continued casting that cloud throughout the litigation until it was cleared by the judicial system. It was at that point that the statute of limitations began to run.

In the ensuing trial, the jury found Gross and Foley Hoag (but not ATTA) liable, and awarded E&G compensatory and punitive damages totaling $980,000. Superior Court Judge Henry Kennedy, before whom the case was tried, denied the lawyer defendants' post-verdict motion for judgment as a matter of law or for a new trial. This appeal followed.

4. E&G's earlier tortious interference claim against ATTA alone, which had been stayed pending the appeal of the quiet title action, see note 2 *supra,* eventually was consolidated with the claim in the December 1992 action.

5. E&G also asserted claims of abuse of process and malicious prosecution. Those claims were dismissed before trial and are not at issue in this appeal. E&G subsequently amended its complaint to add a claim under the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* The case then was removed to the United States District Court for the District of Columbia. The RICO claim eventually was dismissed on the ground that the

alleged acts of wrongdoing did not demonstrate the "pattern of racketeering" required by the federal statute, but rather only a single scheme, directed at few victims, and resulting in a single, distinct injury. *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n,* 310 U.S.App. D.C. 409, 414, 48 F.3d 1260, 1265 (1995). With only common law claims remaining, the case was returned to the Superior Court. *See id.,* 310 U.S.App. D.C. at 415–16, 48 F.3d at 1266–67.

6. After losing in the Court of Appeals, the defendants had ninety days to petition the Supreme Court for a writ of certiorari. *See* 28 U.S.C. § 2101(c).

## II.

The cause of action for tortious interference with contract is subject to a three-year statute of limitations. *See* D.C.Code § 12–301(8) (2001).[7] The question we must decide is whether that statute had run by the time E&G sued Gross and Foley Hoag for tortious interference in December 1992.

■■■ The statute of limitations on a tort claim ordinarily begins to run when the plaintiff sustains a tortious injury or— if the so-called "discovery rule" applies because "the relationship between the fact of injury and the alleged tortious conduct [is] obscure," *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C.1994) (en banc)— when the plaintiff knows or reasonably should know that the cause of action exists.[8] *See id.* at 473; *see also Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 298–299 (D.C.2001); *Diamond v. Davis*, 680 A.2d 364, 372 (D.C.1996) (holding that under the discovery rule, cause of action accrues "when the plaintiff has either actual notice of her cause of action or

is deemed to be on inquiry notice because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice"). At the latest, therefore, a cause of action accrues for limitations purposes when "the plaintiff 'knows' or 'by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing.'" *Hendel v. World Plan Executive Council*, 705 A.2d 656, 660–61 (D.C.1997) (quoting *Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423, 435 (D.C.1986)). Under this rule, the plaintiff does not have "*carte blanche* to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm." *Hendel*, 705 A.2d at 661. Nor need all damages be sustained, or even identified, for the cause of action to accrue; "[a]ny 'appreciable and actual harm flowing from the [defendant's] conduct' is sufficient." *Id.* (quoting *Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C.1989)).[9]

---

7. *See also Carr v. Brown*, 395 A.2d 79, 83–84 (D.C.1978) (agreeing that three-year limitations period applies to cause of action for tortious interference). *Accord, Zandford v. Nat'l Ass'n of Sec. Dealers, Inc.*, 30 F.Supp.2d 1, 23 (D.D.C.1998), *aff'd mem.*, 343 U.S.App. D.C. 52, 221 F.3d 197 (2000); *Jones v. Meridian Towers Apartments, Inc.*, 816 F.Supp. 762, 768 (D.D.C.1993).

8. The running of a statute of limitations may be tolled under certain circumstances, e.g., where the plaintiff is under a disability recognized by statute, *see* D.C.Code § 12–302 (2001), or, where, pursuant to the "continuous representation" rule, a cause of action for legal or medical malpractice does not accrue until the attorney-client or doctor-patient relationship is terminated. *See Anderson v. George*, 717 A.2d 876, 877–78 (D.C.1998); *R.D.H. Communications, Ltd. v. Winston*, 700 A.2d 766, 768 (D.C.1997). In addition, where the defendant has "done anything ... to lull the plaintiff into inaction," thereby affirma-

tively inducing the plaintiff not to file a timely lawsuit, the defendant may be estopped from asserting the bar of the statute of limitations. *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986) (quoting *Hornblower v. George Washington Univ.*, 31 App. D.C. 64, 75 (1908)). Except as discussed *infra*, no issue of tolling or lulling is presented in this case.

9. In general, a "one-action rule applies ...: the plaintiff must bring a single suit for all present and future damages flowing from a discrete [tortious] act ... as soon as he or she becomes aware of some injury on which to base the suit." *Keefe Co. v. Americable Int'l, Inc.*, 755 A.2d 469, 476 (D.C.2000). *See, e.g., Colbert*, 641 A.2d at 473 ("The discovery rule does not, however, permit a plaintiff who has information regarding a defendant's negligence, and who knows that she has been significantly injured, to defer institution of suit and wait and see whether additional injuries come to light."); *John McShain, Inc. v.*

Invoking these principles, Gross and Foley Hoag argue that E&G knew that it had been injured by their allegedly tortious conduct in 1987, when they clouded title to Alban Towers by recording ATTA's purported right of first refusal with the Recorder of Deeds. E&G demonstrably knew in 1987 that it had a claim for tortious interference, Gross and Foley Hoag contend, because it intervened in the quiet title action and asserted that very claim against ATTA. In 1988, moreover, in a motion that it filed in the quiet title action, E&G expressly acknowledged that it might have similar claims against other potential defendants, presumably including ATTA's lawyers. See note 2 *supra.* At the very least, Gross and Foley Hoag conclude, E&G was on "inquiry notice" of its tortious interference claim against them, well over three years before it sued them on that claim in December 1992.

E&G does not dispute that it knew or should have known of its potential tortious interference claim against Gross and Foley Hoag more than three years before it filed its complaint. Nor does E&G claim that it was subject to a disability that prevented it from suing, or that Gross and Foley Hoag did anything to lull it into passivity. See note 7, *supra.* E&G argues, however, that "when a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases." *Page v. United States,* 234 U.S.App. D.C. 332, 335–36, 729 F.2d 818, 821 (1984) (citations omitted). As a wrongdoer acquires no immunity by continuing the wrong, "the cumulative effect of the conduct [is] actionable." *Id.,* 729 F.2d at 822. According to E&G, Gross and Foley Hoag committed a continuing tort against it by litigating the

quiet title action in bad faith, and its cause of action therefore did not accrue until that continuing tort ceased with the termination of the litigation and the removal of the cloud on title. E&G argues that it did not know that it had been injured before the litigation finally was resolved in its favor, because only then did it learn that it could not secure adequate financing to proceed with the purchase of Alban Towers.

We cannot accept E&G's argument. Our cases specifically have rejected the expansive application of the continuing tort doctrine exemplified in *Page* and employed by Judge Levie in ruling that the statute of limitations was tolled until the quiet title litigation finally was concluded. E&G knew or should have known that it was appreciably injured by the *lis pendens* from the outset, when Gross filed a notice of ATTA's claimed right of first refusal with the Recorder of Deeds in January 1987. Under our case law, the continuation of the litigation therefore did not delay the accrual of E&G's cause of action, and the statute of limitations ran on any tortious conduct by Gross or Foley Hoag that occurred prior to December 1, 1989, *i.e.,* more than three years before E&G filed suit. While the lawyer defendants theoretically might have been liable for continuing the tort *sub silentio* for a few months past December 1, 1989—on the premise that because they did not concede formally, the quiet title litigation did not end conclusively until the time for filing a petition for a writ of certiorari had expired—E&G suffered no incremental injury attributable to the defendants' post-December 1, 1989 conduct.

■ In the District of Columbia, a "continuing tort" can be established for statute of limitations purposes by showing "(1) a

*L'Enfant Plaza Props., Inc.,* 402 A.2d 1222, 1231 (D.C.1979) ("Courts have resisted attempts to hinge the running of the statute of

limitations upon the complete ascertainability of lost profits.").

continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act ... within the limitation period." *DeKine v. District of Columbia,* 422 A.2d 981, 988 n. 16 (D.C. 1980) (citations omitted). The concept is allied with the discovery rule. In certain types of cases—for example, cases involving claims of occupational injury—the wrongfulness and injuriousness of tortious activity may be discernible only from the continuation over time of a course of conduct. Thus, we have said that "[i]f the continuing tort has a cumulative effect, *such that the injury might not have come about but for the entire course of conduct* ...," then all damages caused by the tortious conduct are recoverable even though some of the conduct occurred outside the limitations period." *McShain,* 402 A.2d at 1231 n. 20 (emphasis added). It makes sense to say that the running of the limitations period is tolled until the continuation of the wrongful conduct renders the existence of the cause of action sufficiently manifest to permit the victim to seek recovery.

On the other hand, "once the plaintiff has been placed on notice of an injury and the role of the defendants' wrongful conduct in causing it, the policy disfavoring stale claims makes application of the 'continuous tort' doctrine inappropriate." *Hendel,* 705 A.2d at 667. *Accord, Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 883 (D.C.1998); *Nat'l R.R. Passenger Corp. v. Krouse,* 627 A.2d 489, 497–98 (D.C.1993). When the plaintiff is or should be aware that he or she is being injured by a continuing tort, the statute of limitations begins to run. The plaintiff then may recover only for injuries attributable to the part of the continuing tort that was committed within the limitations period immediately preceding the date on which suit is brought. *See, e.g., Hendel,* 705 A.2d at 667–68. *Accord, McShain,* 402 A.2d at 1231 n. 20 ("If ... the continuing tort is of the type that causes a series of separate or recurrent injuries, then only those damages stemming from conduct occurring within the limitations period are recoverable.").

E&G argues that the maintenance of litigation in bad faith is a continuing tort "because its effects persist from the initial filing to the final disposition of the case." *Whelan v. Abell,* 293 U.S.App. D.C. 267, 277, 953 F.2d 663, 673 (1992). ATTA's defense and counterclaim in the quiet title action was "repetitive" conduct, E&G contends, "in that it represent[ed] the assertion, every day, of [ATTA's] claim." *Id.* All that may be true, but by itself it is not enough to delay the accrual of a tortious interference cause of action that is predicated on a party's conduct in litigation. The *Whelan* court deemed a lawsuit to be "a continuous, not an isolated event," *id.,* for the purpose of assessing its impact, not for the purpose of tolling the running of the statute of limitations. As the *Whelan* court itself stated, a party aggrieved by wrongful litigation may suffer substantial damage that is easily identifiable before the lawsuit is finished, if only "from the cumulative costs of defense and the reputational harm caused by an unresolved claim." *Id.* The statute of limitations therefore may start to run before the tortious litigation concludes.

E&G relies principally on *L'Enfant Plaza E., Inc. v. John McShain, Inc.,* 359 A.2d 5 (D.C.1976), as did Judge Levie, but that reliance is misplaced. In *McShain,* the plaintiff sued for damages caused by a subterranean encroachment on its property. The plaintiff sued more than three years (the applicable limitations period) after it learned of the encroachment, but less than three years after the encroach-

ment was removed. The court held that the complaint was "not necessarily" time-barred, because the trespass was continuing, and the cause of action "accrued on the date of the trespass and continued until three years after the encroachment had been removed." *Id.* at 7. E&G analogizes the "encroachment on the title to Alban Towers" throughout the quiet title litigation to the physical encroachment in *McShain,* and argues that its cause of action likewise was not time-barred, inasmuch as it was filed within three years of the termination of the encroachment.

This argument overlooks a critical aspect of our holding in *McShain.* We stated that the plaintiff's recovery was "limited to damages resulting from the trespass during 'the [three-year] statutory period preceding the filing of the suit.'" *Id.* (citation omitted). We specifically held that any claim for damages experienced prior to that period was "barred by the statute of limitations." *Id. See also McShain,* 402 A.2d at 1230–31 (holding that damages for lost profits attributable to encroachment on days outside the limitations period were not recoverable even though the lost profits were not completely ascertainable until later). *McShain* is thus fully consistent with *Hendel, Wallace,* and *Krouse.* Once the plaintiff is on notice of the continuing tort—of the fact of injury and the defendant's responsibility for it—the statute of limitations commences to run, and claims based on tortious conduct outside the limitations period are time-barred even if claims based on subsequent wrongful activity are not.

As is implied by the fact that it actually did lodge a claim of tortious interference against ATTA in 1987 (in the quiet title action), E&G knew or should have known before December 1, 1989 (three years before it filed suit) that it sustained appreciable injury from the *lis pendens* in

effect up to that date. E&G argues that it could not know whether it would be unable to go through with its contract to purchase Alban Towers until the *lis pendens* terminated and it learned that the continuing cloud on title had caused it to lose the financing it needed to complete the transaction. Be that as it may, under E&G's contract with Georgetown, every month of delay caused by the *lis pendens* added $35,000 to the price that E&G would have to pay for Alban Towers. Based on that fact alone, E&G knew or should have known throughout the quiet title litigation that the defendants' conduct in perpetuating the cloud on title was causing it appreciable harm. E&G's cause of action for tortious interference therefore accrued as the *lis pendens* was maintained, even if all of E&G's damages were not fully ascertainable until a later time. The three-year statute of limitations ran, and E&G's claims based on pre-December 1, 1989 conduct are time-barred.

Judge Levie reasoned that, at least as a technical matter, the cloud on title created by Gross and Foley Hoag remained in place for a few months after this court issued its decision in the quiet title litigation on December 1, 1989. Assuming that was so, we would agree that the statute of limitations had not run on wrongs perpetrated on or after that date when E&G filed suit in 1992. This point is of no help to E&G, however, for it was not delayed or impeded in its renewed efforts to close on its contract with Georgetown by the theoretical pendency of the quiet title litigation after December 1, 1989. Rather, E&G sustained its entire damages as a consequence of the pre-December 1, 1989, litigation-caused delay. As of that point, the increases in the purchase price and in construction costs meant that E&G no longer could proceed to close on the purchase of Alban Towers, though it promptly

tried to do so. Thus, that the cloud on title technically may have lasted for a few months after December 1, 1989, did not result in any additional injury to E&G for which it could recover through its tortious inference claim.

### III.

In conclusion, we hold that by the time E&G brought its tortious interference claim against Gross and Foley Hoag, the statute of limitations had run. We reverse the judgment on appeal.

*So ordered.*

RUIZ, Associate Judge, concurring:

This is a straightforward case, so I have no trouble agreeing that the cause of action for tortious interference with contract arose well before the three-year limitations period prior to commencement of the lawsuit and is therefore time-barred. The facts are clear that appellant knew that it had a cause of action against appellee, but failed to file at the time it filed a related case against another defendant. No damages can be awarded on those stale claims. To the extent that the defendant continued its tortious interference over time and into the limitations period, the majority recognizes that claims based on those activities are not time-barred and would be actionable if they had resulted in compensable damages.

Not all continuing violations are the same, however. Where, unlike here, the nature of the violation is such that to claim redress it is necessary to prove sustained conduct, or a pattern and practice, the time when the claim comes into existence can be less than clear. The usual concern about staleness "disappears" so long as some act that is part of such a continuing violation occurs within the limitations period. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Certain discrimination claims are examples. *See id.* (practice of racial steering under the Fair Housing Act, 42 U.S.C. §§ 3604, 3612(a)); *Morgan v. National R.R. Passenger Corp.,* 232 F.3d 1008, 1017 (9th Cir.2000) *cert. granted,* —— U.S. ——, 121 S.Ct. 2547, 150 L.Ed.2d 715, 69 U.S.L.W. 3789 (U.S. June 25, 2001) (No. 00–1624) (employment discrimination based on hostile working environment under Title VII, 42 U.S.C. § 2000e–5(e)). Moreover, there are policy reasons grounded in the broad remedial purpose of civil rights statutes giving rise to such claims as well as practical considerations in an ongoing relationship that warrant an approach that comports with the reality of a continuing practice of discrimination. These types of claims are not implicated here and, therefore, are not addressed by the court's opinion in this case.