953 F.2d 663
 293 U.S.App.D.C. 267, 21 Fed.R.Serv.3d 1273
 Andrew J. WHELAN, et al., Appellants,
v.
Tyler ABELL, individually, and as a member of the law firm
of Bregman, Abell & Kay, et al.
ANIMATED PLAYHOUSES CORPORATION, et al., Appellants,
v.
Tyler ABELL, individually and as a member of the law firm of
Bregman, Abell & Kay, et al.
Andrew J. WHELAN, et al., Appellants,
v.
Tyler ABELL, individually, and as a member of the law firm
of Bregman, Abell & Kay, et al.
 Nos. 90-7016 to 90-7018.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 10, 1991.
Decided Jan. 17, 1992.
Amended on Rehearing March 30, 1992.
 
 [293 U.S.App.D.C. 269] Appeals from the United States District Court for the District of Columbia (87cv01763, 89cv01625 and 87cv00442).
 Loren Kieve, Washington, D.C., for appellants. Thomas Carroll, Washington, D.C., also entered an appearance for appellants.
 George R. Kucik, with whom Michael E. Jaffe and Gerald Zingone, Washington, D.C., were on the brief, for appellee John B. Toomey.
 Nelson Deckelbaum and Arthur G. Kahn, Washington, D.C., were on the brief for appellee Tyler Abell.
 [293 U.S.App.D.C. 270] William A. Hylton, Jr., Baltimore, Md., was on the brief for appellee Estate of Anthony Chase.
 Before RUTH BADER GINSBURG, SILBERMAN, and THOMAS,* Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 These consolidated cases arise out of the failure of Animated Playhouses Corporation (Corporation), a restaurant chain founded by appellants Andrew Whelan and Edward Whelan. Appellees Tyler Abell, Anthony Chase,[1] and John Toomey purchased one of the Corporation's restaurants and brought legal actions against the Whelans and the Corporation regarding misrepresentations allegedly made during the purchase negotiations. These actions concluded without determination of liability. The Whelans then sued Abell, Chase, and Toomey, charging them with a number of common law torts, including malicious prosecution and abuse of process. The district court ruled against the Whelans on all counts. The Whelans raise numerous challenges to the district court's decisions.[2] We affirm three of the challenged rulings, reverse the others, and remand for further proceedings.
 
 I.
 A.
 
 2
 The Whelans, who were major investors in and senior officers of the Corporation,[3] planned to develop a nationwide chain of family entertainment restaurants featuring three-dimensional animated characters. In 1982, they sold to Abell and Chase the Corporation's first restaurant located in Putty Hill, Maryland. Shortly thereafter, Abell and Chase sold a one-third interest in their investment to Toomey, referring to their partnership as ACT Associates (ACT).[4]
 
 
 3
 The Putty Hill restaurant as well as the chain as a whole proved unsuccessful. The parties hotly contest the cause of the business' failure, but it is undisputed that once the business' problems became apparent, ACT attempted to force the Whelans and the Corporation to make large payments to the partners. ACT threatened the Whelans with legal action over alleged illegalities committed during the 1982 negotiations for the Putty Hill restaurant if the Whelans did not agree to take certain actions. ACT demanded that the Corporation buy back the restaurant and assume the debt the partners incurred to finance the purchase. ACT further demanded that the Whelans transfer to ACT most of their personal shares in the Corporation. When pressing these demands, ACT pointed out that a lawsuit would seriously impede the Corporation's efforts to raise additional capital and that the Whelans could not afford to litigate. And to make the point more dramatically, ACT also apprised the Corporation's major investors of the potential litigation by sending them copies of a letter threatening legal action and a draft complaint.
 
 
 4
 [293 U.S.App.D.C. 271] Eventually the partners carried out their threats. In March 1984 ACT filed a lawsuit against the Corporation and the Whelans (Putty Hill lawsuit), alleging mail and wire fraud, securities fraud, franchise law violations, and racketeering. All of the charges rested on alleged misrepresentations made in the course of the 1982 negotiations. ACT also sent a letter to the Maryland Attorney General's Office in February 1984 claiming that the Corporation and Andrew Whelan violated the Maryland Franchise Disclosure Act, MD.CODE ANN., Art. 56, § 345-365D. The Maryland Securities Commission issued a show cause order and in November 1984 Andrew Whelan entered into an "undertaking" with the Commission in which he neither admitted nor denied wrongdoing. The agreement provided that satisfaction of its terms would result in a rescission of the show cause order one year later.
 
 
 5
 The Corporation and other of the Whelans' business ventures subsequently suffered a string of setbacks. A venture capital firm on the verge of injecting large amounts of capital into the Corporation withdrew, and the Corporation filed for bankruptcy in July 1984; a separate venture involving a network of walk-in medical clinics failed; the Whelans were forced to relinquish most of their holdings in a pharmacy venture; and Andrew Whelan was unable to secure franchise rights in an unrelated restaurant business when his net worth declined below the franchisor's minimum requirements.
 
 
 6
 The Putty Hill lawsuit never went to trial. At a status conference, Judge Gesell expressed his belief that ACT had not brought the action in good faith, and he told the partners to "fish or cut bait." Abell and Toomey subsequently moved to dismiss the Whelans from the case in October 1984. Judge Gesell dismissed the suit against the Whelans in February 1985, and he dismissed the rest of the case in 1986.
 
 
 7
 In December 1984, however, ACT had filed a second lawsuit on essentially the same claims against the lawyers who had represented the Whelans and the Corporation during ACT's acquisition of the Putty Hill restaurant. After a bench trial, Judge Gesell dismissed that case with prejudice. He found that
 
 
 8
 plaintiffs [Abell, Chase, and Toomey] have failed to prove their claims. Neither defendant individually nor in association with others engaged in any fraudulent act or misrepresentation, intentionally or otherwise. In their dealings with plaintiffs, each defendant made full disclosure of facts known to them and did not omit to state any material fact.
 
 
 9
 Abell v. Elmer, 1990 Fed.Sec.L.Rep. (CCH) p 92,448, at 92,731, 1985 WL 5836 (D.D.C.1985). He also described the suit as "nothing more than a desperate attempt by disappointed investors to create a cause of action where none exists." Id. Relying in part on Judge Gesell's decision, Andrew Whelan sought rescission of his undertaking with the Maryland Securities Commission. The Commission vacated the undertaking in November 1985 "in accordance with [its] terms."
 
 B.
 
 10
 By 1987 the legal actions initiated by ACT were .oncluded. The Whelans then turned round and sued ACT,[5] charging the partners with tortious interference with prospective business advantage, breach of fiduciary duty, wrongful involvement in litigation, abuse of process, and malicious prosecution. Chase defaulted soon after the suit was filed, and default orders were entered against him. Abell and Toomey, however, persevered in their defense.
 
 
 11
 Before the case went to trial, the district court denied the Whelans' partial summary judgment motion, which, relying on Judge Gesell's findings in Abell v. Elmer that no fraud or misrepresentation occurred during the 1982 negotiations, sought to preclude Abell and Toomey from defending in this action on the ground that their original lawsuit was warranted. The court, on the [293 U.S.App.D.C. 272] other hand, granted Abell and Toomey's partial summary judgment motions dismissing the malicious prosecution, abuse of process, and wrongful involvement in litigation claims. Only the tortious interference with prospective business advantage and breach of fiduciary duty claims thus remained.
 
 
 12
 On the first day of the jury trial, Abell and Toomey moved to bar any testimony concerning the lost value of the Whelans' investments in the Corporation on the ground that only the Corporation itself could recover for such loss. The district court agreed and granted the motion. At the close of the Whelans' case, the court also directed a verdict for Abell and Toomey on the breach of fiduciary duty claim on the ground that only the Corporation could assert claims arising out of that alleged misconduct. These rulings left only the Whelans' tortious interference claim, limited, of course, to the damage inflicted on business opportunities unrelated to the Corporation.
 
 
 13
 The jury returned a verdict for Andrew Whelan but against Edward Whelan on that sole remaining count.[6] Post-verdict conversations between the Whelans' counsel and several jurors led the Whelans to conclude that the jury had meant to find Abell and Toomey liable to Edward Whelan, too, and had made a mistake in recording the verdict. The Whelans thus filed motions requesting that the court interview the jurors and seeking permission to obtain jurors' affidavits. The court denied these motions. Abell and Toomey moved for judgment n.o.v. with respect to the verdict in favor of Andrew Whelan and that motion was granted. The court also denied the Whelans' post-trial motion to add the Corporation as a plaintiff and dismissed a separate complaint filed by the Corporation to recover on its own behalf. Finally, the court vacated the default orders against Chase and entered judgment in his favor, even though Chase did not participate in the litigation and presented no excuse for his default.
 
 
 14
 The Whelans appeal the numerous adverse rulings against them, with the exception of the order granting summary judgment on the wrongful involvement in litigation claim.
 
 II.
 A.
 
 15
 The district court "determined that it would be procedurally unfair" to accord preclusive effect to fact findings Judge Gesell made in Abell v. Elmer. The court stressed that in the prior adjudication, ACT had, and failed to carry, the burden of proof, while in this case, the proof burden had shifted to the Whelans. The district judge also noted the altered character of the proceedings: Abell v. Elmer had been a bench trial, while the case at hand, pursuant to the Whelans' demand, would be tried before a jury. Finally, the judge noted that the issues in the two cases were not identical.
 
 
 16
 While we agree with the Whelans that the two cases present some common issues, we do not regard the district court's ruling as an abuse of discretion, and we therefore affirm the court's judgment on this point. It is true that " 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.' " McLaughlin v. Bradlee, 803 F.2d 1197, 1201 (D.C.Cir.1986) (quoting Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980)). The Whelans, however, who seek to preclude ACT from contesting certain issues based on the prior adjudication in Abell v. Elmer, were not parties to that litigation. When a non-party invokes issue preclusion, considerations may hold sway that would not block preclusion when the second action is between the same parties. See RESTATEMENT (SECOND) OF JUDGMENTS § 29 comment b (1982).
 
 
 17
 Cogent precedent supports the position "that preclusive effect should not be given to the first determination when the party [293 U.S.App.D.C. 273] sought to be concluded had a heavier burden (or his adversary had a lighter burden) in the first proceeding than in the second." Id. § 28 reporter's note at 289 (citing cases). As a counterweight to the proof burden shift present here, the Whelans note that ACT, as plaintiffs in the Abell v. Elmer action, had both the incentive and the opportunity to litigate with undiluted zeal. See James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 461-63 (5th Cir.) , cert. denied, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971). The district judge, however, considered relevant to his exercise of discretion a factor that reflected the Whelans' choice, not that of ACT: the Whelans' jury trial demand.
 
 
 18
 Were this a bench trial, we might have greater reason to question the district court's refusal to accord preclusive effect to findings made in Abell v. Elmer. Cf. Synanon Church v. United States, 820 F.2d 421 (D.C.Cir.1987). The presence or absence of a jury as factfinder, the Supreme Court has noted, in itself is a "basically neutral" factor. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 332 n. 19, 99 S.Ct. 645, 652, n. 19, 58 L.Ed.2d 552 (1979); see also 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4423, at 223 (1981); id. § 4465, at 600 (preclusion may not be defeated simply by manifest differences between judge and jury trial). It was not improper, however, in the circumstances here presented, for the district judge to note the altered character of the trier demanded by the parties urging preclusion.
 
 
 19
 A ruling for the Whelans on issue preclusion might have given them a head start larger than warranted in the jury's deliberations. The judge, in other words, indicated concern not simply about the difference in factfinders; rather, his practical judgment turned on the prospect of skewing or distorting the jury's judgment in the particular setting before him. We cannot say that it was unsound for the district judge, in view of the proof burden shift and his concern about unduly swaying or confusing the jury, to exercise his discretion in favor of allowing both sides to submit their full case to the jury's judgment. See Parklane Hosiery Co., 439 U.S. at 331, 99 S.Ct. at 651 (regarding offensive use of issue preclusion by nonparties, the preferable approach for federal courts is not to preclude recourse to the doctrine, "but to grant trial courts broad discretion to determine when it should be applied"). Accordingly, we leave undisturbed the district court's ruling denying preclusive effect to findings made in Abell v. Elmer.
 
 B.
 
 20
 The district court granted Abell and Toomey's motion for summary judgment dismissing the malicious prosecution claims on the ground that the Whelans had failed to establish an essential element of the claims: termination of the Putty Hill lawsuit and the Maryland administrative proceeding favorable to themselves. Since, under our reading of District of Columbia law, the question should have been submitted to the jury, we reverse.
 
 
 21
 It is generally thought that "to prevail in a claim of malicious prosecution, plaintiff must plead and prove [that] the underlying suit terminated in plaintiff's favor." Morowitz v. Marvel, 423 A.2d 196, 198 (D.C.1980). Following California law, the District of Columbia Court of Appeals has determined that favorable termination does not require a final disposition on the merits; rather, any termination that "reflects on the innocence of the defendant in the underlying suit" may suffice. Brown v. Carr, 503 A.2d 1241, 1245 (D.C.1986) (citing Minasian v. Sapse, 80 Cal.App.3d 823, 827, 145 Cal.Rptr. 829, 832 (1978)). A disposition on procedural grounds (such as dismissal for failure to file within the limitations period), for example, generally will not constitute favorable termination. See id. Still, as the district court below recognized, the voluntary dismissal of a legal action in some circumstances tends to indicate the original defendant's innocence and therefore may satisfy the favorable termination requirement. See Minasian, 80 Cal.App.3d at 827, 145 Cal.Rptr. at 832.
 
 
 22
 Favorable termination is ordinarily "a question of law ... to be determined by [293 U.S.App.D.C. 274] the trial court." Weisman v. Middleton, 390 A.2d 996, 1003 (D.C.1978). We agree with the district court that as a matter of law the Maryland administrative proceeding did not terminate favorably to the Whelans. Andrew Whelan's undertaking with the Maryland Securities Commission was essentially a settlement that did not reflect favorably (or unfavorably) on his innocence, see Minasian, 80 Cal.App.3d at 827 n. 4, 145 Cal.Rptr. at 832 n. 4, and the order vacating the undertaking plainly states that it was vacated according to its own terms--not, as appellants suggest, because of Judge Gesell's findings in Abell v. Elmer.
 
 
 23
 We disagree, however, with the district court's ruling regarding the termination of the Putty Hill litigation. Appellees contend that they sought to dismiss the lawsuit because the Whelans' insolvency would prevent recovery on any judgment obtained. The Whelans argue that the circumstances surrounding the dismissal, particularly Judge Gesell's disparagement of the case and his admonition to ACT to "fish or cut bait," demonstrate that the partners actually dismissed the lawsuit because it was frivolous--which, if true, would reflect on the Whelans' "innocence." When an allegedly malicious action is terminated voluntarily and the original plaintiff's motivation for seeking dismissal is disputed, the question whether the termination was favorable to the original defendant should be submitted to the jury. See id. at 828, 145 Cal.Rptr. at 832. Factual questions concerning ACT's reasons for dismissing the Putty Hill lawsuit remain, and because of that, we believe that the district court erred in deciding the matter on a summary judgment motion. Accordingly, we reverse the district court's order dismissing the malicious prosecution claims with respect to the Putty Hill litigation.
 
 C.
 
 24
 The district court also granted Abell and Toomey's motion for summary judgment on the Whelans' abuse of process claims. To establish abuse of process, a plaintiff must show "a perversion of the judicial process and achievement of some end not anticipated in the regular prosecution of the charge." Morowitz, 423 A.2d at 198. The essence of the tort is the use of legal process for improper purposes, and so abuse of process is conceptually different from, but overlaps with, malicious prosecution, the latter of which occurs only when a legal action is brought without probable cause. See Neumann v. Vidal, 710 F.2d 856, 860 (D.C.Cir.1983) (construing D.C. law). The Whelans alleged both a perversion of the judicial process (legal proceedings designed to compel concessions in a business relationship) and the accomplishment of an improper result (harm to the Whelans' investment in the Corporation and to their other business opportunities). The district court granted Abell and Toomey's summary judgment motion on the ground that the Whelans had failed to establish two additional propositions: that ACT "unjustly procured a seizure or distraint of some kind" and that the partners actually achieved their "ulterior objective"--namely, obtaining financial concessions from the Whelans. We think that the court, by asking that much from the Whelans, misconstrued District of Columbia law.
 
 
 25
 We find no support for the requirement that the plaintiff in the allegedly abusive action must have fully achieved his ulterior goal. The District of Columbia Court of Appeals has held only that "some end not contemplated in the regular prosecution of the charge" must be accomplished. Morowitz, 423 A.2d at 198 (emphasis added). And we have previously determined that an injury markedly similar to the one claimed by the Whelans can support an abuse of process claim. In Neumann v. Vidal, the plaintiff alleged that the defendant had filed a lawsuit and instituted patent proceedings in order to prevent the plaintiff from conducting business. We reversed the district court's dismissal of the plaintiff's abuse of process claim, holding that the jury should decide whether the challenged proceedings "were essentially designed 'to accomplish some end which the process was not intended by law to accomplish'--such as frightening off [the plaintiff's] investors or delaying his [293 U.S.App.D.C. 275] getting underway." Neumann, 710 F.2d at 860 (quoting Hall v. Field Enterprises, Inc., 94 A.2d 479, 481 (D.C.1953)). It made no difference whether the plaintiff asserting abuse of process actually succumbed to the pressure; indeed, it would be perverse for courts to deny relief to those who steadfastly defend themselves against abusive actions and are hurt in the process. We therefore think it quite sufficient that, allegedly at least, appellees succeeded in deliberately causing collateral damage (apart from the litigation itself) to the Whelans as part of their scheme. As we read the law of the District, an allegation that the original plaintiff seriously damaged the complaining party's business opportunities for an unfulfilled purpose, such as coercing financial concessions, is adequate to satisfy the "achievement" element of the tort.
 
 
 26
 We do not believe that our opinion in Yellow Bus Lines, Inc. v. Drivers Local Union 639, 883 F.2d 132 (D.C.Cir.1989) (construing D.C. law), although ostensibly favorable to appellees, requires a different result. That case involved an allegation that a union business director had sued an employer for improper purposes, one of which was to coerce the employer to sign a collective bargaining agreement. We held that to prevail on an abuse of process claim, the employer had to demonstrate "not only ulterior motive, but success in achieving illegitimate ends with resulting injury." Id. at 137-38. We upheld a judgment against the employer in part because no significant injury was proven: the union dropped its demand for a collective bargaining agreement, and the parties settled the allegedly abusive action for $3,000. See id. at 138. Mere allegation that a party filed suit to obtain an "ordinary" settlement is insufficient for a claim of abuse of process. Id. (citing Morowitz, 423 A.2d at 198). By contrast, intentionally causing severe financial injury through the prosecution of legal proceedings, as the Whelans allege ACT did here, is, as Neumann v. Vidal indicates, quite a different matter.
 
 
 27
 Nor do we find a distraint or seizure requirement in District of Columbia law. The district court apparently extrapolated this notion from two cases--Hall v. Hollywood Credit Clothing Co., 147 A.2d 866 (D.C.1959), and Hall v. Field Enterprises, Inc., 94 A.2d 479 (D.C.1953)--in which the plaintiffs in the original action obtained attachments and the District of Columbia Court of Appeals (then the Municipal Court of Appeals for the District of Columbia) found that they had stated claims of abuse of process. That these are the only cases in which the Court of Appeals has permitted abuse of process actions does not establish attachment (or similar judicially sanctioned interference with property or person) as a necessary element of the tort. For similar reasons, we think that appellees' reliance on Neumann v. Vidal in this context is misplaced. It is true that the original plaintiffs in that case obtained an injunction, but we neither held nor suggested that this factor was necessary to our decision to allow an abuse of process claim. See Neumann, 710 F.2d at 860-61. We therefore reverse the district court's order granting summary judgment on appellants' abuse of process claims.
 
 D.
 
 28
 The next question is the validity of the district court's ruling that the Whelans could not recover damages for the lost value of their investments in the Corporation, and of the directed verdict on the Whelans' breach of fiduciary duty claim. The Whelans alleged that Abell and Chase, who served as counsel to the Corporation (Chase also served as director), breached a fiduciary duty owed to the Whelans. We uphold the directed verdict because under D.C. law, an attorney's fiduciary duty is owed to the company, not the shareholders. See Egan v. McNamara, 467 A.2d 733, 738-40 (D.C.1983).
 
 
 29
 Appellees claimed that the Whelans could not sue for the lost value of their investments in the Corporation because the Whelans were not the real parties in interest. We do not reach the merits of this [293 U.S.App.D.C. 276] argument, which would require us to explore substantive law regarding the circumstances under which a shareholder can recover for injuries to a corporation, because Abell and Toomey did not raise it until the first day of trial. We are of the view that the district court abused its discretion by granting the motion that late in the proceedings.
 
 
 30
 Appellees recharacterize their real-party-in-interest defense on appeal (using the terminology employed by the district court) and assert that the Whelans lacked Article III standing, a jurisdictional issue that can be raised at any time. To be sure, courts have on occasion denied stockholders' suits alleging injury, asserting that the stockholders lacked "standing" to bring such an action because the stockholders, "experiencing no direct harm, possess[ ] no primary right to sue." Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732 (3d Cir.1970) (emphasis added), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); accord EMI Ltd. v. Bennett, 738 F.2d 994, 996-97 (9th Cir.), cert. denied, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984); Stevens v. Lowder, 643 F.2d 1078, 1080 (5th Cir.1981). But we do not read these cases as actually turning on the question whether the stockholder has suffered a sufficiently direct injury to establish Article III injury or causation. The courts do not conduct that kind of analysis. It may well be that if a minor injury is suffered by a large corporation it would be difficult to trace a "distinct and palpable injury" to a shareholder, Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), but that would certainly not be so if the damage was to a closely held corporation. Conceptually, then, the problem is not an Article III one. See Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (economic injury satisfies Article III).
 
 
 31
 Standing and real-party-in-interest questions do overlap to the extent that both ask whether the plaintiff has a personal interest in the controversy. See 6A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1524, at 329-30 (1990). But the question whether the suit should be brought by the Whelans or the Corporation really depends, as we have noted, on considerations and conventions of corporate law--whether the corporation should be entitled to bring an action, at least in the first instance, without the distraction of stockholders' suits--which we think are brought into play under Rule 17(a) of the Federal Rules of Civil Procedure.
 
 
 32
 Rule 17(a) states that "[e]very action shall be prosecuted in the name of the real party in interest." FED.R.CIV.P. 17(a). In other words, the action must be brought by the person entitled under the governing substantive law to enforce the asserted right. See District of Columbia ex rel. American Combustion, Inc. v. Transamerica Ins. Co., 797 F.2d 1041, 1048 (D.C.Cir.1986). A real-party-in-interest defense can be raised as a Rule 12(b)(6) motion, stating, in effect, that because the plaintiff is not the person who should be bringing the suit, the plaintiff has "fail[ed] to state a claim upon which relief can be granted."[7] FED.R.CIV.P. 12(b)(6). And a Rule 12(b)(6) motion can be raised at trial. See id. 12(h)(2). Rule 17(a), however, provides that "[n]o action shall be dismissed on [real-party-in-interest grounds] until a reasonable time has been allowed after objection for ratification of commencement of the action by ... the real party in interest." Id. 17(a). This implies that the defense may not be raised at any time, for the real party must have the opportunity to step into the "unreal" party's shoes and should not be prejudiced by undue delay. See 6A C. WRIGHT, A. MILLER & M. KANE, § 1554, at 407 ("Regardless of what vehicle is used for presenting the objection [12(b)(6) motion or 8(c) defense], it should be done with reasonable promptness."). For this reason, we hold that where a Rule 17(a) defense is made, judges abuse their discretion in allowing the plea as late as the start of the trial if the real party has been prejudiced by the defendant's laxness. See, e.g., Gogolin & Stelter v. Karn's Auto Imports, Inc., 886 F.2d 100, 102-03 (5th [293 U.S.App.D.C. 277] Cir.1989) (Rule 17(a) defense waived when made at the close of the plaintiff's evidence), cert. denied, 494 U.S. 1031, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990); Hefley v. Jones, 687 F.2d 1383, 1388 (10th Cir.1982) (defense waived when made sixteen days before trial).
 
 
 33
 In this case, Rule 17(a) "ratification" was impossible because Abell and Toomey did not raise the real-party-in-interest issue until the trial was underway. The prejudice here is particularly acute because the Corporation, the alleged real party in interest, was in the hands of a bankruptcy trustee. The considerable lapse of time (not to mention the numerous adverse rulings the district court had made before the trial had even begun) may have hampered the Whelans' ability to induce the trustee to join the action. The trustee might have been more willing to risk litigation at the beginning of the bankruptcy proceedings, when unrelated claims were certain to prevent the winding down of the estate, than two years into the bankruptcy, when the trustee's task might have been nearing completion. The possibility of the Whelans buying the Corporation's claim from the trustee, moreover, may well have evaporated over the two years during which discovery in this case was conducted. We therefore reverse the decision to preclude evidence about the lost value of the Whelans' stock.[8]
 
 E.
 
 34
 Appellants also challenge the judgment n.o.v. (now called judgment as a matter of law) as to the jury's verdict that ACT tortiously interfered with Andrew Whelan's prospective business opportunities unrelated to the Corporation. To establish this tort under District of Columbia law, the plaintiff must show that the defendant intentionally interfered with business opportunities that were "commercially reasonable to anticipate." Carr v. Brown, 395 A.2d 79, 84 (D.C.1978). The district court determined that no reasonable jury could have found for Andrew Whelan because the opportunities that were allegedly frustrated did not exist or were insufficiently concrete when ACT sent the complaint letter to the Maryland Securities Commission and filed the Putty Hill lawsuit in, respectively, February and March of 1984. We agree with appellants, however, that the alleged tort consisted not solely of these two discrete acts, but also of ACT's continued prosecution of legal proceedings against the Whelans.
 
 
 35
 Assuming, arguendo, that Andrew Whelan had no concrete business opportunities at the time ACT initiated the legal actions against the Whelans, a decision in Andrew Whelan's favor could stand only if the allegedly tortious conduct "continued" until the opportunities became concrete. Under District of Columbia law, a plaintiff establishes a continuing tort by showing "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act within the limitation period." DeKine v. District of Columbia, 422 A.2d 981, 988 n. 16 (D.C.1980) (quotation marks and citation omitted). We need not decide whether the prosecution of an administrative proceeding (such as the Maryland Securities Commission investigation), which is conducted independently by the agency once a complaint is filed, can constitute a continuing tort on the part of the complainant, because we agree with appellants that the ongoing prosecution of a lawsuit (such as the Putty Hill litigation) can suffice.
 
 
 36
 It seems to us that a lawsuit is a continuous, not an isolated event, because its effects persist from the initial filing to the final disposition of the case. It is repetitive in that it represents the assertion, every day, of the plaintiff's claim. Cf. Neumann v. Vidal, 1982-2 Trade Cas. (CCH) p 64,933, at 72,770, 1981 WL 2218 (D.D.C.1981) (holding that the statute of limitations on an abuse of process charge begins to run not when the defendant institutes the allegedly abusive claim, but when he ceases to assert it). A defendant subject to a lawsuit is likely to suffer damage not so much from the initial complaint but from [293 U.S.App.D.C. 278] the cumulative costs of defense and the reputational harm caused by an unresolved claim.
 
 
 37
 Appellees mistakenly rely on our statement in Fitzgerald v. Seamans, 553 F.2d 220 (D.C.Cir.1977), that "the mere failure to right a wrong and make the plaintiff whole cannot be a continuing wrong," id. at 230, to suggest that they cannot be held liable for failing immediately to dismiss their complaints against the Whelans. We believe that Fitzgerald is inapposite. In that case, a federal employee claimed, in order to avoid a statute of limitations, that the Civil Service Commission's failure to provide him with complete relief was part of a "continuing conspiracy." We rejected this argument because an exception for unredressed wrongs would obliterate the limitations rule. See id. at 229-30. A decision regarding an employment discharge is a single act that finalizes relations between the parties, while the commencement of a lawsuit is only the first link in a chain of conduct that does not end until the complaining party ceases prosecution of the suit. Cf. Page v. United States, 729 F.2d 818, 821-22 (D.C.Cir.1984) ("[When] no single incident in a continuous chain of tortious activity can 'fairly or realistically be identified as the cause of significant harm,' it seems proper to regard the cumulative effect of the conduct as actionable." (quoting Fowkes v. Pennsylvania R.R., 264 F.2d 397, 399 (3d Cir.1959))).
 
 
 38
 Appellees cannot " 'be allowed to acquire a right to continue [their allegedly] tortious conduct,' " id. at 822 (quoting Fletcher v. Union Pac. R.R., 621 F.2d 902, 908 (8th Cir.1980)), simply on the ground that the Whelans' business expectancies were too contingent when ACT commenced the Putty Hill lawsuit. The evidence presented at trial amply supports the conclusion that both the medical clinic and pharmacy opportunities and Andrew Whelan's franchise opportunity in the unrelated restaurant business crystallized well before Abell and Toomey moved to dismiss the Whelans from the suit in October 1984.[9] Because the judgment n.o.v. is based on an incorrect theory of the law of tortious interference with prospective business advantage, we reverse.
 
 F.
 
 39
 We affirm the district court's denial of appellants' motions asking that the court interview the jurors and seeking leave to obtain jurors' affidavits in order to ascertain their true verdict on Edward Whelan's claim of tortious interference with his business opportunities unrelated to the Corporation. The court denied the Whelans' motions because the jurors had three separate opportunities to repudiate the verdict against Edward Whelan--the foreman's recitation of the verdict, the jury's collective affirmation of it, and a poll of individual jurors--and at no point did any juror indicate that the verdict was incorrect. The court also observed that any reservations jurors subsequently expressed to the Whelans' counsel may have been influenced by counsel's leading questions or post-trial advocacy, and that allowing jurors' second thoughts to disturb their decision would threaten the finality of all jury verdicts.
 
 
 40
 Decisions regarding ascertainment of the jury's true verdict are within the trial court's discretion, see Freid v. McGrath, 135 F.2d 833, 834 (D.C.Cir.1943), and the court did not abuse its discretion in this case. The possibility of leading questions and post-trial arguments masquerading as inquiries was substantial, and we recognize the potential for abuse in the procedures appellants suggested.
 
 G.
 
 41
 Finally, appellants would have us reverse the district court's ruling vacating the default orders against Chase. Appellees defend the district court's orders on the ground that Chase's co-defendants Abell and Toomey were successful on all [293 U.S.App.D.C. 279] counts. They rely on the venerable case Frow v. De La Vega, 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872), in which the plaintiff alleged that eight defendants had jointly conspired to defraud him of title to a large tract of land. The lower court entered a default judgment against one defendant who failed to answer on time but found for the remaining defendants on the merits. The result was two irreconcilable judgments: according to the default decree, the plaintiff held title; under the judgment on the merits, the seven other defendants did. The Supreme Court reversed, holding that "where a bill makes a joint charge against several defendants ... a final decree on the merits against the defaulting defendant alone" cannot stand. Id. 82 U.S. at 554.
 
 
 42
 In Carter v. District of Columbia, 795 F.2d 116 (D.C.Cir.1986), however, we construed Frow narrowly to hold that in cases involving multiple defendants, a default order that is inconsistent with a judgment on the merits must be set aside only when liability is truly joint--that is, when the theory of recovery requires that all defen dants be found liable if any one of them is liable--and when the relief sought can only be effective if judgment is granted against all. See id. at 137. Chase's liability in this case is not so intertwined with Abell's and Toomey's that consistent findings against each of them are necessary. Nor does judgment in favor of Abell and Toomey make monetary recovery from Chase practically impossible.
 
 
 43
 Although we therefore reject appellees' reasoning in this regard and vacate the district court's ruling setting aside the default orders against Chase, the district court on remand is free to consider whether to vacate the default orders in accordance with FED.R.CIV.P. 55(c), which provides that the court may set aside an entry of default "[f]or good cause."
 
 
 44
 * * * * * *
 
 
 45
 In sum, we affirm the district court's denial of appellants' motion to accord issue preclusion to Judge Gesell's findings in Abell v. Elmer, and we sustain the directed verdict on the breach of fiduciary duty claim. We also affirm the district court's orders denying appellants' motions to ascertain the true meaning of the jury's verdict against Edward Whelan on his claim of tortious interference with his business opportunities unrelated to the Corporation.
 
 
 46
 We reverse the district court on all of the other issues raised in this appeal. The order precluding the Whelans from introducing evidence about damage to the Corporation is reversed, as are the summary judgments against the Whelans on their malicious prosecution and abuse of process claims. We remand for further proceedings on these issues. The judgment n.o.v. against Andrew Whelan on his claim of tortious interference with opportunities unrelated to the Corporation is reversed as well. The district court did not rule on 18 other grounds for judgment n.o.v., or new trial, raised by ACT, and on remand is free to address them. And, finally, we vacate the district court's orders setting aside the defaults entered against Chase. On remand, the judge may consider whether good cause warrants setting aside these orders.
 
 
 47
 It is so ordered.
 
 ORDER
 
 48
 March 30, 1992.
 
 
 49
 Before: RUTH B. GINSBURG and SILBERMAN, Circuit Judges.
 
 
 50
 On consideration of appellees' petitions for rehearing and the response thereto, it is
 
 
 51
 ORDERED, by the court, that the petition for rehearing is granted in part, and the opinion filed on January 17, 1992 is amended as follows:
 
 
 52
 It is FURTHER ORDERED, by the court, that appellees' petitions for rehearing are otherwise denied. The rule that a real-party-in-interest claim is waived if not presented until trial is properly applied to this case. The petitions for rehearing point to pretrial documents in which the claim was purportedly raised, but appellees did not call these documents to the court's attention when the case was argued. The panel's holding regarding abuse of process is not inconsistent with the District of Columbia Court of Appeals' recent discussion of the tort in Bown v. Hamilton, No. 90-769, 1992 D.C.App. LEXIS 14 (D.C. Jan. 17, 1992).
 
 
 
 *
 Former Circuit Judge Thomas, now an Associate Justice of the Supreme Court of the United States, was a member of the panel when the case was argued but did not participate in this opinion
 
 
 [1]
 Anthony Chase has died, and his estate is an appellee in this case. We will refer to both as "Chase."
 
 
 [2]
 We assume that District of Columbia law applies to appellants' common law claims. In their arguments to the district court, the parties relied primarily on District of Columbia law, and the district judge concluded that the parties had agreed that District of Columbia law governed
 
 
 [3]
 The Corporation established two subsidiaries, Animated Entertainment Systems Corporation and Captain Andy's River Towne Corporation, to operate the entertainment and restaurant businesses. All three companies are appellants in one of the consolidated cases before us. We will refer to the Corporation singly and together with its subsidiaries as "Corporation."
 
 
 [4]
 We will use the acronym "ACT" to refer both to Abell, Chase, and Toomey acting collectively and to one partner acting on behalf of the partnership
 
 
 [5]
 The Whelans filed identical complaints in the District of Columbia and the District of Maryland. The latter case was transferred to the District of Columbia, where the two cases were consolidated
 
 
 [6]
 In one of its prior rulings, the court bifurcated the trial, limiting the first trial to liability issues
 
 
 [7]
 We note that the question how a Rule 17(a) defense is raised (as a 12(b)(6) motion or as a Rule 8(c) affirmative defense) remains unsettled. See 6A C. WRIGHT, A. MILLER & M. KANE, § 1554, at 405-09
 
 
 [8]
 In light of this disposition, we need not reach the other issues raised by appellants regarding the district court's decision to deny various attempts to make the Corporation a plaintiff
 
 
 [9]
 Edward Whelan testified that the Whelans' medical clinic, which apparently was later turned into the pharmaceutical interest, was incorporated in March 1984, and Andrew Whelan testified regarding a business plan for, and deposit made on, the separate restaurant franchise before July 1984